FILED

2021 Sep-22  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD CHEATWOOD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:17-cv-00984-MHH** |
| | } | |
| **CITY OF VESTAVIA HILLS,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

In this action brought under the Age Discrimination in Employment Act, Richard Cheatwood, a former police officer for the City of Vestavia Hills, alleges that the City denied him a promotion to Patrol Corporal because of his age-and then terminated him because he filed this action.   Officer Cheatwood asserts claims against the City for age discrimination and retaliation.   The City has asked the Court to enter judgment in its favor on Officer Cheatwood's claims.   (Doc. 53).   This opinion resolves the City's motion.

## I.      Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   To demonstrate that there is a genuine dispute as to a material

fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, in this opinion, the Court views the evidence in the light most favorable to Officer Cheatwood.

## II.   Summary Judgment Evidence

The City of Vestavia Hills hired Richard Cheatwood as a patrol officer in 1998. (Doc. 53-1, p. 4, tp. 14; Doc. 60, p. 2, ¶ 1).[1] The circumstances that give rise to this action began to unfold when Officer Cheatwood publicly criticized the City in a January 2016 Facebook post. He wrote: "Amazing, a couple of people burned to death in an apartment fire. Last night night [sic] awards were given to those who

---

[1] Doc. 60 is Officer Cheatwood's response to the City's summary judgment motion. In his response, Officer Cheatwood admitted facts that appear in the discussion of summary judgment evidence that follows. Unless otherwise noted, cites to Doc. 60 indicate that a fact is undisputed.

allowed 2 people to burn to death." (Doc. 53-1, pp. 6–7, tpp. 24–25; Doc. 53-2, p. 10). According to Officer Cheatwood, two fellow officers stopped their patrol cars and blocked the path of a fire truck attempting to respond to an apartment fire in which two people died. (Doc. 53-1, p. 7, tp. 26).[2]

On January 21, 2016, Officer Cheatwood's supervisor, Sergeant Sean Richardson, gave Officer Cheatwood an informal verbal counseling about his attitude and documented the counseling in a memorandum. (Doc. 53-2, pp. 11–12; Doc. 60, p. 2, ¶ 4). The memorandum states that Sgt. Richardson had "no issue with [Officer Cheatwood's] work product," but he was concerned with Officer Cheatwood's attitude. (Doc. 53-2, p. 11). Sgt. Richardson wrote to Officer Cheatwood: "I have a deep and sincere respect for you and your ability as a Police Officer. Your knowledge and ability to perform this job at the highest level is not in question. I know you are capable. The question is, Are you willing?" (Doc. 53-2, p. 12).

According to Sgt. Richardson, during his conversation with Officer Cheatwood, Officer Cheatwood was so angry about the way he felt he was being

_____

[2] In his response to the City's motion for summary judgment, Officer Cheatwood moved to strike evidence regarding the January 2016 fire and his related Facebook post because they were "not relevant to this case" and because he "was not denied a promotion or terminated as a result. . . ." (Doc. 60, p. 2, ¶¶ 2–3). As will become apparent, the Facebook post set in motion a series of events that bear upon Officer Cheatwood's effort to obtain a promotion to Patrol Corporal. Consequently, evidence regarding the Facebook post is relevant and properly appears in the summary judgment record.

treated in the police department that he was near tears. (Doc. 53-2, p. 11). Sgt. Richardson commented: "You harbor deep personal resentments against some people in this Department. Some of your resentments are genuine," but "[y]ou have told me that you are not capable of overcoming the resentment that you feel." (Doc. 53-2, p. 12). Sgt. Richardson offered Officer Cheatwood counseling and advised that a good attitude was "critical to the function of the shift as it operates as a team. . . . There are life and death consequences involved with this profession. Team Work is essential." (Doc. 53-2, p. 11). Sgt. Richardson indicated that Officer Cheatwood requested a transfer to nightshift, and he responded: "I feel that requesting a transfer to another shift, simply because I am asking you to not display a negative attitude at work is an over-reaction to a reasonable request." (Doc. 53-2, p. 11). Officer Cheatwood had difficulty recalling the meeting; he denied discussing his negative attitude, the ability to receive counseling, or his request to transfer. (Doc. 53-1, pp. 13–14, tpp. 49, 52–53).

Sgt. Richardson held a formal verbal counseling session with Officer Cheatwood on January 26, 2016. (Doc. 53-2, pp. 13–15; Doc. 60, p. 2, ¶ 5). Corporal Brad Vincent and Corporal Doug Layton attended. (Doc. 53-2, pp. 13, 14). Sgt. Richardson discussed Officer Cheatwood's "[o]ver reaction" to criticism, stress and its effects, attitude, and "[m]ood swings, unreasonable resentments, and not taking responsibility of ones [sic] own actions," and the way in which these issues

4

"effect [sic] Officer Cheatwood and his co-workers."  (Doc. 53-2, p. 13).  Officer

Cheatwood mentioned that his mother and father had died within the previous five

years and that his wife had not worked for two years.  (Doc. 53-2, p. 15).  Sgt.

Richardson attributed some of Officer Cheatwood's behavior to the stress from those

circumstances.  (Doc. 53-2, p. 15).  Sgt. Richardson also believed that Officer

Cheatwood experienced stress because he harbored resentments.  Officer Cheatwood

"stated that he was very resentful of the department because through his career he

had been promised positions that he was never given."  (Doc. 53-2, p. 14).

According to Sgt. Richardson, Officer Cheatwood remarked that "he stays up all

night thinking about things and that he'[d] had 'About 15 years of Fucking hell.'"

(Doc. 53-2, p. 15).  Sgt. Richardson gave Officer Cheatwood information about

employee assistance through American Behavioral EAP.  (Doc. 53-2, pp. 13, 15).

Officer Cheatwood remembers being read a memo and receiving the American

Behavioral EAP brochure.  (Doc. 53-1, p. 16, tpp. 62–63).

By letter dated January 27, 2016, Chief of Police Danny Rary ordered Officer

Cheatwood to report to American Behavioral Employee Assistance Programs for a

counseling interview the following day.  (Doc. 53-2, p. 16; Doc. 60, p. 2, ¶ 6).

Lieutenant Harding also ordered Officer Cheatwood verbally to attend the session.

(Doc. 53-2, p. 17).  Chief Rary provided the address for the interview and two contact

numbers.  (Doc. 53-2, p. 16).  Officer Cheatwood attended his interview.  (Doc. 53-1, p. 18, tp. 72).

According to a memorandum dated January 28, 2016 and signed by Cpl. Layton, when Officer Cheatwood returned from the American Behavioral interview, he asked for a City Policy Manual.  (Doc. 53-2, p. 17).  Later that day, he returned and accused Lt. Harding of violating city policy "by not telling him why he had to attend a mandatory counseling session with Employee Assistance."  (Doc. 53-2, p. 17).  The memorandum states that Officer Cheatwood also suggested to Cpl. Layton that the City should pay him to not talk about his accusation that two people died in an apartment fire because police vehicles blocked firefighters' access to the building. (Doc. 53-2, p. 17).  At his deposition, Officer Cheatwood denied the statements and did not recall a conversation with Cpl. Layton like the one reflected in the January 28 memo.  (Doc. 53-1, pp. 19–21, tpp. 74–82).

At the end of Officer Cheatwood's shift on February 1, 2016, he had a conversation in Sgt. Richardson's office.  (Doc. 53-1, pp. 21–22, tpp. 84–86; Doc. 53-2, p. 19).  Several officers were present.  (Doc. 53-1, p. 22, tp. 85; Doc. 53-2, p. 19).  Officer Cheatwood testified that during this conversation, he was laughing and joked:  "[Y]'all don't get in trouble [in Liberty Park] because I won't be able to find you."  (Doc. 53-1, p. 22, tp. 85).  Liberty Park is an area of Vestavia Hills Officer Cheatwood had not patrolled since 2002; Officer Cheatwood testified that he was

joking that he would get lost.  (Doc. 53-1, p. 22, tp. 85; *see also* Doc. 53-2, p. 38).
According to a memorandum dated February 2, 2016 and signed by Corporal Jared
Freeman, the issue arose because, at the end of his shift, Officer Cheatwood reported
that he had no back-ups for the day.  Cpl. Freeman told Officer Cheatwood that he
should have backed up Officer Giles during three traffic stops because he (Officer
Cheatwood) and Officer Giles were the only two officers "working on the east side."
Officer Cheatwood "stated something to the effect of 'Ya'll [sic] better not get into
anything serious because I'm not backing anyone up when I'm over there.'"  (Doc.
53-2, p. 19).  Cpl. Freeman wrote that Officer Cheatwood's remark concerned "an
issue of officer safety."  (Doc. 53-2, p. 19).  At his deposition, Officer Cheatwood
denied Cpl. Freeman's version of the statement.  (Doc. 53-1, pp. 21–22, tpp. 84–85).

On February 2, 2016, Officer Cheatwood missed a mandatory counseling
session because he arrived too late for his appointment.  (Doc. 53-2, p. 20; Doc. 60,
p. 3, ¶ 10).  Officer Cheatwood explained that he did not mean to miss the
appointment.  (Doc. 53-1, p. 24, tp. 96; Doc. 60, p. 3, ¶ 10).

On February 4, 2016, the Internal Affairs Division of VHPD opened an
official investigation to explore complaints against Officer Cheatwood.  (Doc. 60, p.
4, ¶ 11).  Chief Rary reported that Officer Cheatwood may have "violated several
departmental policies including (1) conduct unbecoming a Police Officer, (2)
insubordination or disrespect toward a supervisor, (3) speaking critically or

derogatorily to or about other officers, [and] (4) violating policy concerning social networking web sites." (Doc. 53-2, p. 21). VHPD notified Officer Cheatwood of the investigation on February 9, 2016. (Doc. 53-2, p. 25; Doc. 60, p. 4, ¶ 12).

As part of the investigation, Internal Affairs interviewed Officer Cheatwood on February 16, 2016. According to a memorandum documenting the interview, Officer Cheatwood admitted to telling Cpl. Layton that he hated the VHPD, saying in jest that he would not back up fellow officers, and posting on his Facebook account his understanding of the events surrounding the apartment fire in which two people died. (Doc. 53-2, p. 38). Officer Cheatwood allegedly acknowledged stating that one of his superiors was a lieutenant "because he kisses ass . . . ." (Doc. 53-2, p. 38). In his deposition, Officer Cheatwood acknowledged the Facebook post but denied making the other admissions during the interview. (Doc. 53-1, pp. 35–36, tpp. 140–144).

In an email dated February 18, 2016, VHPD solicited applications for the positions of Patrol Corporal and Field Training Officer. (Doc. 53-2, p. 23; Doc. 60, p. 4, ¶ 13). The email stated: "To be considered for either position, you must . . . be in good standing with the Department." (Doc. 53-2, p. 23). Under Jefferson County Personnel Board rules, which apply to City of Vestavia Hills police officers, "Good Standing" means not subject to "ongoing discipline, or suspension, or investigation into alleged misconduct." (Doc. 53-2, p. 35; Doc. 60, p. 4, ¶ 14). Officer Cheatwood

applied for the Patrol Corporal position on February 23, 2016, (Doc. 53-2, p. 23; Doc. 60, p. 4, ¶ 15), a few days before Internal Affairs completed its investigation of Chief Rary's complaint against him on February 26, 2016, (Doc. 53-2, p. 40). Officer Cheatwood was 45 years old when VPHD made several of his fellow officers Patrol Corporals.  (Doc. 54, p. 1, ¶ 4; Doc. 60, p. 4, ¶ 17).

Officer Cheatwood did not receive the promotion, and he was the only applicant who did not receive an interview.  (Doc. 61, p. 9, tp. 33).  The interviews took place in March of 2016.  (Doc. 53-2, p. 23).  On April 4, 2016, VHPD promoted three officers to Patrol Corporal:  Richard Wilcox, Ralph McCall, and Mark Gibbs. (Doc. 54, p. 1, ¶ 2).  On October 1, 2016, VHPD promoted another officer, Matthew Peoples, to Patrol Corporal.  (Doc. 54, p. 1, ¶ 3).  At the time of the promotions, Officer Peoples was 31 years old; Officer Wilcox was 35 years old; Officer McCall was 43 years old; and Officer Gibbs was 52 years old.  (Doc. 54, p. 1, ¶¶ 2–3; Doc. 60, p. 4, ¶ 17).  Each officer that VPHD elevated to Patrol Corporal was qualified for the position.  (Doc. 60, p. 5, ¶ 20).  Each officer that VHPD promoted to Patrol Corporal had fewer years of experience with the VHPD than Officer Cheatwood. (Doc. 61, p. 15, tpp. 58–59).

Following the Internal Affairs investigation of Officer Cheatwood, VHPD charged him with conduct unbecoming a police officer, insubordination, speaking critically or derogatorily about other officers, and neglect of duty.  (Doc. 53-2, p.

40).  On February 26, 2016, VPHD gave Officer Cheatwood written notice of a pre-determination hearing on March 4, 2016 concerning the charges.  (Doc. 53-2, p. 40). After the hearing, Chief Rary found Officer Cheatwood guilty of conduct unbecoming a police officer under the Jefferson County Personnel Board Rules and Regulations.  (Doc. 53-2, p. 42; Doc. 60, p. 5, ¶ 22).  Based on Chief Rary's findings and recommendation, Vestavia Hills City Manager Jeffrey Downes, who had the authority to hire and fire police officers, suspended Officer Cheatwood for 15 days without pay, effective March 18, 2016.  (Doc. 53-2, p. 43; Doc. 60, pp. 5, 10, ¶¶ 22, 41).[3]

When Officer Cheatwood returned to work from his suspension, VHPD reassigned him from patrol to the jail.  (Doc. 55, p. 44; Doc. 60, p. 5, ¶ 23).  His duties at the jail included taking walk-in reports and assisting the jail desk officers in booking, fingerprinting, and releasing prisoners.  (Doc. 55, pp. 44–45).  Chief Rary informed Officer Cheatwood that VHPD would find another position for him if he worked at the jail for one year.  (Doc. 53-2, p. 44; Doc. 56, p. 141–42).

On September 11, 2016, Officer Cheatwood filed an EEOC charge of discrimination.  (Doc. 1-1; Doc. 60, p. 5, ¶ 25).  In it, he asserted that the City discriminated against him because of his age when the City denied him a promotion

_____

[3] The Jefferson County Personnel Board upheld the 15-day suspension on August 16, 2016.  (Doc. 58).

to Patrol Corporal in April and September of 2016.  (Doc. 1-1, p. 1).  On November 6, 2016, Officer Cheatwood sent a nine-page email to the Vestavia Hills mayor-elect in which he (Officer Cheatwood) asserted that members of the VHPD had committed perjury regarding his February 2016 Internal Affairs investigation.  (Doc. 53-1, pp. 53–54, tpp. 211–16; Doc. 60, p. 5, ¶ 26).

On December 7, 2016, Officer Cheatwood asked to speak with Captain Kevin York.  (Doc. 53-1, p. 61, tp. 243; Doc. 53-2, p. 44).  Earlier that day, Captain York had spoken to Sergeant Watts, the lead desk sergeant working in the jail, and indicated concern after hearing over the radio that officers were being called off patrol to handle reports and fingerprints in the jail, duties assigned to Officer Cheatwood.  (Doc. 53-2, p. 44; Doc. 55, pp. 34–35).  Officer Cheatwood suspected that other officers had complained about him not doing his job.  (Doc. 53-2, p. 44). Though no officer had complained, Sgt. Watts implemented a new procedure to produce a record of Officer Cheatwood's availability for calls.  (Doc. 53-2, p. 45; Doc. 60, p. 6, ¶ 28).  Officer Cheatwood believes that the underlying cause of the incident was his EEOC complaint of age discrimination.  (Doc. 53-1, p. 61, tpp. 243–44).  A few days later, Officer Cheatwood revised his EEOC charge and added an allegation of retaliation.  (Doc. 53, p. 15, ¶ 29; Doc. 60, p. 6, ¶ 29).[4]

_____

[4] The Court has not located a copy of Officer Cheatwood's second EEOC charge in the record. The City indicated that the charge is Exhibit 21 to Officer Cheatwood's deposition, (Doc. 53, p.

Several months later, on April 24, 2017, Officer Cheatwood's supervisor at the jail, Sergeant Jared Freeman, instructed him to complete a motor vehicle accident report for a walk-in citizen. (Doc. 53-2, p. 46; Doc. 55, pp. 115–16). At his deposition, Officer Cheatwood testified that he responded to Sgt. Freeman that desk sergeants usually have a traffic officer complete an accident report and that if he (Officer Cheatwood) were to complete the accident report like a traffic officer, he wanted the five percent increase in pay that traffic officers received. (Doc. 53-1, p. 64, tp. 254; *see also* Doc. 53-2, p. 46). Sgt. Freeman testified that he considered the incident insubordinate, and he had to ask Officer Cheatwood twice to complete the report. (Doc. 55, pp. 116–17). Officer Cheatwood did complete the accident report. (Doc. 53-2, p. 46; Doc. 55, p. 116; Doc. 57, p. 52).

The following day, April 25, 2017, while Officer Cheatwood was fingerprinting a citizen, (Doc. 53-1, p. 64, tp. 256), Sgt. Freeman accused him of not processing an inmate, (Doc. 53-1, p. 64, tp. 256). Officer Cheatwood testified that Sgt. Freeman incorrectly believed that he was on booking duty; he actually was assigned to fingerprinting duty. (Doc. 53-1, p. 65, tp. 257). Sgt. Freeman believed that Officer Cheatwood was insubordinate that day for initially refusing to process out an inmate as instructed, telling Sgt. Freeman to not talk to him, and informing

---

15, ¶ 29), but the Court does not see Exhibit 21 in the record, (Doc. 53-2) (containing the Cheatwood deposition exhibits).

Sgt. Freeman that he (Officer Cheatwood) had filed an EEOC complaint against him. (Doc. 55, pp. 119–20; *see also* Doc. 53-2, p. 46).  Officer Cheatwood processed out the inmate as instructed.  (Doc. 53-2, p. 46; Doc. 55, p. 120; Doc. 57, p. 53).  Officer Cheatwood feels that both accusations of insubordination were retaliation for his EEOC charge.  (Doc. 53-1, p. 65, tp. 260).

Chief Rary testified:  "After the April 2017 incident, it became quite apparent to me that [Officer Cheatwood] was becoming a severe distraction to the efficient operation of the police department in the jail area."  (Doc. 57, p. 3).  In a June 2, 2017 letter requesting a fitness-for-duty examination of Officer Cheatwood, Chief Rary listed more than two dozen reasons that he believed Officer Cheatwood may not be psychologically fit for duty.  (Doc. 53-2, pp. 51–53).  Included in the list was the fact that Officer Cheatwood levied "baseless, and highly inflammatory charges and complaints about 'high ranking members of the [VHPD's] illegal and unethical practices and behaviors'" and the fact that Officer Cheatwood "accus[ed] a multitude of high ranking city and police officials of lying under oath . . . ."  (Doc. 53-2, p. 52. By letter dated June 5, 2017, Chief Rary ordered Officer Cheatwood to appear for a "mandatory fitness for duty exam" on June 6, 2017.  (Doc. 53-2, p. 55).  Officer Cheatwood attended the evaluation, but the meeting was discontinued before a finding could be made.  (Doc. 53-1, pp. 70, 71, tpp. 277-78, 283).

Two days later, on June 8, 2017, Officer Cheatwood filed his complaint in this action. (Doc. 1). On June 12, 2017, in the booking area of the VHPD, Captain Brian Gilham delivered to Officer Cheatwood a letter from Mr. Downes ordering him to appear for a second fitness for duty evaluation scheduled for June 14, 2017. (Doc. 53-1, p. 71, tpp. 281–83; Doc. 53-2, p. 56). Officer Cheatwood testified that he became agitated when he received the letter because he was not given a reason for another evaluation, and he did not think that a second evaluation was necessary. (Doc. 53-1, p. 71, tp. 282).[5] Officer Cheatwood asked to see Mr. Downes to ask why he was being sent to a second evaluation. (Doc. 53-1, p. 71, tpp. 283–84; Doc. 53-2, p. 56). Officer Cheatwood testified that he called his wife and stated: "[T]hey're sending me back to this thing and, you know, I've asked to go to the City to speak with Jeff Downes and they refused." (Doc. 53-1, p. 72, tp. 285).[6]

Corporal James Prine walked past Officer Cheatwood while he was on the phone speaking with his wife about the upcoming assessment. (Doc. 60, p. 24). Cpl.

---

[5] According to Sergeant J. Dease, when Officer Cheatwood left the June 12 meeting with Captain Gilham, Officer Cheatwood seemed very agitated. Sgt. Dease asked Officer Cheatwood if he was planning to file a retaliation lawsuit. According to Sgt. Dease, Officer Cheatwood replied: "oh yea, I am going to get mine." (Doc. 53-2, p. 58). Sgt. Dease reported that Officer Cheatwood stated that he was not going to take a cognitive test "'until they get that 62-year-old mother-fucker to take one.'" (Doc. 53-2, p. 58). When questioned, Officer Cheatwood allegedly told Sgt. Dease that he was referring to Chief Rary. (Doc. 53-2, p. 58). In his deposition testimony, Officer Cheatwood denied speaking to Sgt. Dease. (Doc. 53-1, p. 74, tp. 294).

[6] The VHPD has video evidence of Officer Cheatwood speaking on the phone in the parking lot of the police station. (Doc. 53-2, p. 67; Doc. 60, p. 24).

Prine reported to Chief Rary that Officer Cheatwood was screaming obscenities and that he stated that he had an AK-47 and threatened to attend the upcoming Vestavia Hills City Council meeting. (Doc. 53-2, p. 57). In his deposition, Cpl. Prine testified that, though he could not remember the exact words, he heard Officer Cheatwood "talk[] about whenever he left he would -- he said, before I go to the City Council meeting, I'll be sure to take my AK-47." (Doc. 56, pp. 32–34). Chief Rary ordered that Officer Cheatwood not be allowed back into the police station until he had the second assessment. (Doc. 53-2, p. 57; Doc. 56, p. 109). In his deposition, Officer Cheatwood denied that he threatened to bring an AK-47 to a City Council meeting and testified that he had never owned an AK-47. (Doc. 53-1, p. 72, tp. 285). Officer Cheatwood testified that Cpl. Prine lied about the AK-47 statement because he was offered a promotion in exchange for the lie, and Cpl. Prine was promoted. (Doc. 53-1, p. 72, tpp. 286–87).

According to Officer Cheatwood, when he ended the phone call with his wife, he walked back into the police station. Captain Gilham and Captain Kevin York met him at the door and instructed him to leave. (Doc. 53-1, p. 74, tpp. 294–96). Officer Cheatwood asked for permission to go to the City Council meeting to talk to Mr. Downes there. (Doc. 53-1, p. 74, tp. 296). Captain Gilham and Captain York ordered Officer Cheatwood to not attend the City Council meeting and to not return to the police station. (Doc. 53-1, p. 75, tp. 297). Officer Cheatwood complied; he

did not go to the meeting.  (Doc. 53-1, p. 75, tp. 298).  Following these events, VHPD increased security at City Council meetings.  (Doc. 56, pp. 114–15).[7]

Two days later, on June 14, 2017, Chief Rary withdrew Officer Cheatwood's police powers, and Mr. Downes placed Officer Cheatwood on administrative leave with pay.  (Doc. 53-1, pp. 77–80, tpp. 308–18; Doc. 53-2, pp. 60–61; Doc. 60, p. 12, ¶ 47).

Chief Rary charged Officer Cheatwood with conduct unbecoming a police officer, disobedience to law, insubordination, and threatening violence.  (Doc. 53-2, pp. 62–63).  On June 16, 2017, Chief Rary conducted a pre-determination hearing. Officer Cheatwood appeared and answered several questions.  (Doc. 53-1, p. 82, tpp. 325–27).  Officer Cheatwood denied making the AK-47 statement.  (Doc. 53-2, p. 67).

On June 19, 2017, Chief Rary issued a report in which he found Officer Cheatwood guilty of all charges.  (Doc. 53-2, pp. 64–67; Doc. 60, p. 13, ¶ 49).  Chief Rary recommended that City Manager Downes terminate Officer Cheatwood's employment with the City of Vestavia and advised Officer Cheatwood of his right to appeal to Mr. Downes within three days.  (Doc. 53-2, pp. 64–67).  Chief Rary stated that the AK-47 statement; the April 2017 statements made at the jail, including

---

[7] In addition, out of concern for his staff, Dr. Anderson canceled his appointment with Officer Cheatwood after Chief Rary reported the events of June 12.  (Doc. 53-2, p. 59).

statements concerning an EEOC complaint for retaliation; and the November 2016 email to the mayor-elect supported the charges.  (Doc. 53-2, pp. 64–67).

Officer Cheatwood appealed Chief Rary's decision.  (Doc. 53-1, p. 83, tpp. 330–31).  On June 26, 2017, Mr. Downes held a hearing on Officer Cheatwood's appeal.  (Doc. 53-2, p. 68).  Officer Cheatwood was represented by an attorney at the hearing.  (Doc. 53-2, p. 69).  Officer Cheatwood, his wife, Chief Rary, Cpl. Prine, and others testified at the hearing.  (Doc. 53-1, p. 83, tpp. 331–32; Doc. 53-2, p. 68).  On June 28, 2017, Mr. Downes upheld Chief Rary's recommendation and terminated Officer Cheatwood's employment effective June 29, 2017.  (Doc. 53-2, pp. 68–69).

On July 31, 2017, Officer Cheatwood filed another charge of discrimination with the EEOC.  (Doc. 14-1).  In it, he asserted that the City terminated his employment in retaliation for his EEOC charge concerning age discrimination.  (Doc. 14-1, p. 2).

In count one of his third amended complaint, Officer Cheatwood alleges that the City discriminated against him because of his age when it failed to promote him to Patrol Corporal on April 4, 2016.  (Doc. 40, p. 4, ¶ 26).  In count two, Officer Cheatwood alleges that the City discriminated against him because of his age when it failed to promote him to Patrol Corporal in the fall of 2016.  (Doc. 40, p. 5, ¶ 32).  In count three, Officer Cheatwood alleges that the City retaliated against him for engaging in activity protected under the ADEA by subjecting him to increased

discipline in 2016 and 2017.  (Doc. 40, pp. 5–6, ¶¶ 34–41).  And, in count four, Officer Cheatwood alleges that the City retaliated against him for engaging in activity protected under the ADEA by terminating his employment.  (Doc. 40, p. 7, ¶ 47).

## III.   Analysis

### A.   ADEA Discrimination

The ADEA prohibits employers from discriminating against employees who are 40 years of age or more because of their age.  29 U.S.C. §§ 623(a), 631(a).  When, as here, a plaintiff relies on circumstantial evidence to defeat a motion for summary judgment on his ADEA discrimination claim, the plaintiff may employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).  To establish a *prima facie* case of age discrimination for failure to promote, an employee must demonstrate that:  (1) he "is over forty years old . . . ; (2) he was qualified for the position sought; (3) despite his qualifications, he was rejected for the position; and (4) after his rejection, the employer filled the position with another person who is not a part of the protected class and who was equally or less qualified for the promotion than the plaintiff."  *Cotton v. Enmarket Inc.*, 809 Fed. Appx. 723, 725 (11th Cir. 2020).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for failing to promote the plaintiff. *Sims*, 704 F.3d at 1332–33. The employer only must state a reason for the employment action; the employer does not have to establish that the articulated reason was the actual reason for the adverse action. *Sims*, 704 F.3d at 1332–33. The employer's burden at this stage is "'exceedingly light.'" *Cotton v. Enmarket Inc.*, 809 Fed. Appx. at 725 (quoting *Smith v. Horner*, 839 F.3d 1530, 1537 (11th Cir. 1988)).

If the employer carries its burden, then the burden returns to the employee to demonstrate that the employer's proffered reason is pretext for unlawful age discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). A genuine issue of fact concerning pretext exists if reasonable jurors could find "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated nondiscriminatory reason for the employment action. *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).

Because the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," a plaintiff does not have to use the framework to survive a summary judgment motion. *Smith*, 644 F.3d at 1328 (reversing summary judgment for employer because sufficient circumstantial evidence of discrimination existed apart from the district court's *McDonnell Douglas* analysis). Instead, a plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328. For instance, a plaintiff "will always survive summary judgment if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted). A plaintiff may assemble a convincing mosaic with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). No matter the form of circumstantial evidence, "so long as the circumstantial evidence raises a

reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith*, 644 F.3d at 1328.

In this case, Officer Cheatwood has not established a *prima facie* case of age discrimination under *McDonnell Douglas* because he has not demonstrated that he was qualified for a Patrol Corporal promotion in April of 2016 or in October of 2016. It is undisputed that qualified applicants for the Patrol Corporal position had to be in good standing with the VHPD, and "Good Standing" meant "[n]ot subject to any ongoing discipline, or suspension, or investigation into alleged misconduct" under Personnel Board rules.  (Doc. 60, p. 4, ¶ 14; *see also* Doc. 53-2, p. 35).  It is undisputed that, when Officer Cheatwood applied for the Patrol Corporal promotion in February of 2016, the VHPD Internal Affairs Department was investigating him for alleged misconduct.  (Doc. 53-2, p. 23; Doc. 60, p. 4, ¶ 15).  Based on the information developed in the investigation, City Manager Downes suspended Officer Cheatwood for 15 days without pay effective March 18, 2016, more than midway through the interview process for the Patrol Corporal position.  (Doc. 53-2, pp. 23, 43; Doc. 60, p. 5, 10, ¶¶ 22, 41).  Thus, Officer Cheatwood was not qualified for a promotion in April 2016 when VHPD promoted three of Officer Cheatwood's fellow officers to Patrol Corporal.

When VHPD elevated a fourth officer to the position of Patrol Corporal in October of 2016, the department did not reopen the application process but instead

selected an officer from the February 2016 batch of applicants for the position. (Doc. 61, pp. 8, 14, tpp. 30–31, 54–55). That hiring list was effective for about a year, and the administration "tried to test for it once a year." (Doc. 61, p. 14, tp. 55). Additionally, Officer Cheatwood was not a patrol officer in October of 2016. VPHD had reassigned him from patrol to the Vestavia Hills municipal jail when he returned from his 15-day suspension at the end of March 2016, and Chief Rary had told Officer Cheatwood that "if he gave [them] one good year in the jail he could return to the street." (Doc. 53-2, p. 44; Doc. 55, p. 44; Doc. 60, p. 5, ¶ 23). Thus, Officer Cheatwood was not qualified for a promotion to Patrol Corporal in October 2016.

Beyond the *McDonnell Douglas* framework, Officer Cheatwood lacks sufficient circumstantial evidence of ageism to create a convincing mosaic from which a jury could conclude that the City failed to promote him because of his age. To be sure, if a jury were to accept Officer Cheatwood's testimony, he could establish that Chief Rary and many of his superior officers manufactured stories that ultimately prompted the Internal Affairs' investigation of him. For example, at his deposition, Officer Cheatwood denied that he told Cpl. Layton that the City should pay him to keep quiet about the police officers who responded to the apartment fire. (Doc. 53-1, pp. 19–21, tpp. 74–82). He also denied that he indicated that he would not back up fellow officers and testified that he only joked about getting lost in Liberty Park. (Doc. 53-1, pp. 21–22, tpp. 84–85).

Jurors also could conclude from the evidence that VPHD waited to solicit applications for the Patrol Corporal and Field Training Officer positions until after Officer Cheatwood's supervising officers persuaded Internal Affairs to launch its investigation so that the investigation would derail Officer Cheatwood's ability to pursue a promotion. Internal Affairs opened its investigation concerning Officer Cheatwood on February 4, 2016. (Doc. 53-2, p. 21). VHPD solicited applications for Patrol Corporal from February 18 to February 26, 2016. (Doc. 53-2, p. 23). Internal Affairs concluded its investigation on February 26, 2016, (Doc. 53-2, p. 40), and the investigation results prompted Officer Cheatwood's 15-day suspension and reassignment to the Vestavia Hills jail in March of 2016, rendering Officer Cheatwood ineligible for promotion while Patrol Corporal positions were available. (*See* Doc. 60, pp. 16–17).

And jurors could conclude that the Internal Affairs investigation and the series of clashes between Officer Cheatwood and his superior officers could have been avoided if Sgt. Richardson had granted Officer Cheatwood's January 2016 request for a transfer to nightshift. (Doc. 53-2, p. 11; *see also* Doc. 53-1, pp. 13–14, tpp. 52–53). The officers with whom Officer Cheatwood clashed seemed to be on the day shift.

Even so, Officer Cheatwood has offered no evidence that ties this favorable view of the evidence to age discrimination. The record of Officer Cheatwood's

23

interview with Internal Affairs indicates that he reported "that he hates the department because he feels he does not get enough consideration for advancement or special assignment." (Doc. 53-2, p. 37). In his deposition, Officer Cheatwood acknowledged this statement. (Doc. 53-1, p. 35, tp. 138). Sgt. Richardson's notes of a January 2016 conversation indicate that Officer Cheatwood reported that "through his career he had been promised positions that he was never given." (Doc. 53-2, p. 14). It is undisputed that VHPD hired Officer Cheatwood as a patrol officer in 1998, and he remained a patrol officer until 2016, so he was not promoted over the course of a nearly 20-year career with the VHPD. (Doc. 1-1, p. 1) (September 2016 EEOC charge in which Officer Cheatwood asserted that VHPD hired him in 1998, his rank at the time was "Patrol Officer[,] and he ha[d] been in that position ever since he hired on"). In his deposition, Officer Cheatwood stated that he did not get a motorcycle scout position that he applied for some time before October 2015. The officer who VHPD selected to fill the position is older than Officer Cheatwood. (Doc. 53-1, pp. 46–47, tpp. 184–88). Two of the four officers who VHPD promoted to Patrol Corporal in 2016 were more than 40 years old, making them members of the ADEA's protected class. One of the officers who the VHPD promoted, Officer Gibbs, is seven years older than Officer Cheatwood. Another, Officer McCall, is two years younger than Officer Cheatwood. (Doc. 54, p. 1, ¶¶ 2, 4).

Thus, even if Officer Cheatwood can prove that VHPD manufactured reports of conduct that ultimately made him ineligible for the Patrol Corporal positions that the VHPD filled in April and October of 2016, there is no evidence that Officer Cheatwood's age motivated his superiors to stymie him from qualifying for the position.  Officer Cheatwood was not promoted as a younger officer, and when he reached the age of 40, officers older than him were promoted to positions that he pursued.  Absent evidence that Officer Cheatwood's age motivated the VHPD's conduct toward him, his ADEA discrimination claim fails as a matter of law.

B.    ADEA Retaliation

The ADEA's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d).  The *McDonnell Douglas* burden-shifting framework applies to ADEA retaliation claims. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  A *prima facie* case of retaliation requires proof of three elements.  A plaintiff must demonstrate that he engaged in statutorily protected conduct, that he suffered an adverse employment action, and that the adverse employment action was causally

connected to the statutorily protected conduct.  *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193–94 (11th Cir. 2016).

If a plaintiff carries his initial burden, then the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the challenged employment action.  *Trask*, 822 F.3d at 1194.  A plaintiff bears the ultimate burden of proving that his employer's proffered legitimate reason is pretext for unlawful retaliation.  *Trask*, 822 F.3d at 1194.

The *McDonnell Douglas* burden-shifting framework is not the only way a plaintiff may use circumstantial evidence to defeat a motion for summary judgment on an ADEA retaliation claim.  *See Mathis v. Leggett & Platt*, 263 Fed. Appx. 9, 12 (11th Cir. 2008) (noting that plaintiffs "ordinarily" use *McDonnell Douglas* to establish retaliatory intent with circumstantial evidence) (citing *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997)).  Rather, if any evidence shows "a genuine issue of material fact as to whether his employer acted with . . . retaliatory intent," then the plaintiff will survive summary judgment.  *Mathis*, 263 Fed. Appx. at 12 (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989)).

Here, Officer Cheatwood has satisfied the first element of his *prima facie* case of retaliation under *McDonnell Douglas* because he engaged in activity protected by the ADEA when he filed charges of discrimination on September 13, 2016 and December 12, 2016 and when he filed this lawsuit on June 8, 2017.  *See* 29 U.S.C.

§ 623(d).  Officer Cheatwood's termination is an adverse employment action.  But, Officer Cheatwood has not established a *prima facie* case under *McDonnell Douglas* because he lacks proof of a causal connection between his protected activity—either this lawsuit or his EEOC charges—and his termination.

The process that led to Officer Cheatwood's termination unfolded over the course of approximately two weeks.  Chief Rary sent Officer Cheatwood home on June 12, 2017.  On June 14, 2017, Chief Rary revoked Officer Cheatwood's police powers, and Mr. Downes placed Officer Cheatwood on administrative leave.  Chief Rary conducted a pre-determination hearing on the charges against Officer Cheatwood on June 16, 2017.  Chief Rary found Officer Cheatwood guilty of all charges on June 19, 2017.  Mr. Downes conducted Officer Cheatwood's due process hearing on June 26, 2017.  And Mr. Downes finally terminated Officer Cheatwood's employment effective June 29, 2017.  (*See* Doc. 53-2, pp. 60–69).

Though the two-week process began shortly after Officer Cheatwood filed this lawsuit on June 8, 2017, there is no evidence that the decisionmakers involved in his termination were aware that he had filed his federal lawsuit against the City. Although Officer Cheatwood named Chief Rary in his initial complaint in this action, (Docs. 1, 2), the Court did not issue a summons for Chief Rary until July 10,

2017.  (Doc. 7).[8]  The City received the complaint in this matter by certified mail on July 12, 2017.  (Doc. 8).[9]  Therefore, there is no evidence of a causal connection between Officer Cheatwood's June 8, 2017 complaint and his June 29, 2017 termination.

Officer Cheatwood's EEOC charges clearly played a role in the events leading to his termination.  Chief Rary testified that he ordered Captain York to document the December 2016 conversation with Officer Cheatwood because Chief Rary was notified that Officer Cheatwood modified his EEOC complaint to include a retaliation charge. (Doc. 56, pp. 143–44; Doc. 57, pp. 60–61).  Chief Rary became aware of the April 2017 incidents after Sgt. Freeman filed preliminary charges of insubordination against Officer Cheatwood with Internal Affairs.   Chief Rary testified:

> Due to the ongoing EEOC complaint against the City, after [the April 2017 Internal Affairs investigation] was concluded, I had them give me the findings . . . I put the internal affairs packet with the rest of [Officer Cheatwood's] packet concerning the EEOC suit.  I had met with Mr. Downes, the City manager.  And [the packet] was placed in storage pending the lawsuit as well as us attempting to go forward with trying to get a mental evaluation of Mr. Cheatwood's ability to perform his duties.

---

[8] Chief Rary testified that, on June 12, 2017, the day he set Officer Cheatwood's termination in motion, he did not know that Officer Cheatwood had filed a lawsuit.  (Doc. 57, pp. 53–54).  There is no evidence in the record that contradicts Chief Rary's testimony.

[9] Officer Cheatwood's attorney did not request service on the defendants by certified mail until July 7, 2017.  (Docs. 4, 5).

(Doc. 56, pp. 144–46). Clearly, Chief Rary was aware of Officer Cheatwood's EEOC charges as early as December 2016, and the EEOC charges influenced his decision-making in response to Officer Cheatwood's actions. The EEOC charges partially motivated the documentation of certain incidents for Officer Cheatwood's personnel file.[10] And the EEOC charges may have played a role in the decision to order Officer Cheatwood to attend a mental health evaluation.

In his June 19, 2017 findings against Officer Cheatwood, Chief Rary stated that Officer Cheatwood had displayed insubordination and disrespect to Sgt. Freeman on April 25, 2017 when Officer Cheatwood said to Sgt. Freeman: "'Don't talk to me, I filed an E.E.O.C. complaint against you yesterday for retaliation.'"

---

[10] In his deposition, Officer Cheatwood stated that there is "a lot of manufacturing [of documents] that goes on" when the administration is "trying to – trying to fire somebody or discipline somebody." (Doc. 53-1, p. 20, tp. 78). He stated that the document created after the April 2017 incidents was part of the administration "building a case" against him. (Doc. 53-1, p. 66, tp. 262).

Although Sgt. Dease testified that "any time anything out of the ordinary occurs, it's natural to write a statement," (Doc. 56, p. 66), Captain York's report of the December 7 incident was not written until December 20, and only then at Chief Rary's instruction, (Doc. 53-2, p. 44; Doc. 55, p. 40). Sgt. Watts testified that he prepared reports for both the December 2016 and April 2017 incidents at the direction of superior officers. (Doc. 55, pp. 65, 71). He stated that the April 2017 reports "came after Sergeant Freeman went to the captain. And [he (Sgt. Watts)] was told to document what occurred. [He] documented what occurred . . . [He] didn't document everything." (Doc. 55, pp. 102–03). The Court has not located statements from Sgt. Watts in the summary judgment record, but the evidence demonstrates that Officer Cheatwood's EEOC charges led to increased documentation of his actions. Reasonable jurors could conclude that at least some of the documents in the summary judgment record were created—if not in retaliation for the EEOC charges—with the aim of bolstering the City's position an EEOC investigation or employment discrimination lawsuit. For these reasons, the Court has not accepted as true the City's version of many of the events leading to the letter from Mr. Downes ordering Mr. Cheatwood to appear for a second fitness for duty evaluation on June 14, 2017 and has carefully considered Officer Cheatwood's deposition testimony.

(Doc. 53-2, p. 65).  Sgt. Freeman reported the statement on April 25, 2017.  (Doc. 53-2, p. 46).   According to Chief Rary, Officer Cheatwood acknowledged the statement in his pre-determination hearing.  (Doc. 53-2, p. 65).[11]  Thus, Officer Cheatwood's remark about an EEOC charge factored into Chief Rary's finding that Officer Cheatwood had been insubordinate.

But Chief Rary also found that Officer Cheatwood had violated Alabama law prohibiting terrorist threats when Officer Cheatwood allegedly threatened to get his AK-47 and attend a Vestavia Hills City Council meeting and that Officer Cheatwood had engaged in conduct unbecoming of a police officer when he accused fellow officers of perjury in an email to the mayor-elect.  (Doc. 53-2, pp. 64–67).  Chief Rary testified that Officer Cheatwood would not have been terminated were it not for the AK-47 threat.  (Doc. 57, p. 377; Doc. 60, p. 6, ¶ 26).  City Manager Downes made the final decision to terminate Officer Cheatwood and did so following an evidentiary hearing.  (Doc. 53-2, pp. 68–69).  Mr. Downes based his decision on "a continued series of disruptive activities to the effective and efficient operation of the Vestavia Hills Police Department prior employment record considered."  (Doc. 53-2, p. 68).

---

[11]  Officer Cheatwood's statement was false; he filed his pre-termination EEOC charges in September and December of 2016.

30

The Hearing Officer who reviewed the termination decision found: "Without a doubt, the most critical charge and evidence presented relates to Cheatwood's threat to bring an AK-47 to the City Council meeting." (Doc. 58-1, p. 7). The Hearing Officer continued: "While Cheatwood denies this event ever took place, the credible evidence lends itself to support the City's contentions." (Doc. 58-1, p. 7). The Hearing Officer found:

> Because the evidence was so credible and persuasive that Cheatwood made the statement referencing bringing an AK-47 to a City Council meeting, the termination of Cheatwood should properly be sustained, and whether or not Cheatwood should be terminated based on his alleged violations of policies and procedures during his tenure at the City Jail otherwise, and whether or not the letter written to the Mayor-Elect amounted to insubordinate conduct, is actually peripheral at best and not necessary to adjudicate in this instance. Absent the allegations and conduct of Cheatwood while working at the City Jail, Cheatwood's termination should still be held proper and affirmed based solely on his threat to carry an AK-47 to a City Council meeting.

(Doc. 58-1, p. 8). A Three Judge Review Panel of the Circuit Court of Jefferson County, Alabama affirmed the Hearing Officer's decision. (Doc. 58-2).

On this record, Officer Cheatwood cannot carry his initial burden of proving that his protected conduct before the EEOC, rather than the alleged AK-47 threat, caused his termination. There is no evidence that the hearing officer who reviewed the City's decision or the three judges who reviewed the hearing officer's decision were influenced by Officer Cheatwood's protected activity.

31

Even if this were not the case, Officer Cheatwood has not offered sufficient circumstantial evidence to establish that the City's reasons for firing him were pretext for retaliatory intent.  Even if Officer Cheatwood did not say that he was planning to get an AK-47 and bring it to a City Council meeting, Chief Rary believed, based on the information provided to him, that Officer Cheatwood made the statement during a telephone call in the parking lot of the police station.  "[A]n employer's honest belief that an employee violated its policies can constitute a legitimate reason for termination even if the employer's belief may have been mistaken or wrong."  *Connelly v. WellStar Health Sys., Inc.*, 758 Fed. Appx. 825, 829 (11th Cir. 2019) (citing *Smith v. PAPP Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987)).  Surveillance footage confirmed that Officer Cheatwood was on the phone at the time and place reported by Cpl. Prine.  (*See* Doc. 53-2, p. 67; Doc. 60, p. 12, ¶ 42).[12]  In addition, the City's objective response to Officer Cheatwood's alleged threat on June 12, 2017 indicates that the City honestly believed that Officer

---

[12] Officer Cheatwood contends that the surveillance footage discredits Cpl. Prine's report.  (*See* Doc. 60, pp. 10–12, 23–24).  According to Officer Cheatwood, on the video, he "appears to be very calm and sedate as Officer Prine walked by him.  [Officer] Cheatwood does not appear to be 'yelling', 'screaming', 'going crazy', 'walking in circles', or 'throwing his hands.'  There is absolutely no indication that [Officer] Cheatwood said or did anything to alarm Officer Prine, neighbors, or anyone else in the vicinity."  (Doc. 60, pp. 12, 24).  The surveillance footage is not in the record, so the Court has not had an opportunity to review it.  Chief Rary relied on the surveillance footage to confirm that Officer Cheatwood was on the phone at the time and place reported by Cpl. Prine; Officer Cheatwood does not dispute that the footage corroborates that information.  (*See* Doc. 53-2, p. 67; Doc. 60, pp. 12, 24).

Cheatwood had threatened to bring an AK-47 to a City Council meeting. After the report of the AK-47 threat, Chief Rary ordered Officer Cheatwood to leave the premises immediately, deactivated Officer Cheatwood's access card to the building, added security to the City Council meeting that evening, and increased security at City Council meetings and work sessions for the next couple of months. (Doc. 57, pp. 10–13). There would be no reason to expend such effort if Chief Rary did not believe that Officer Cheatwood made the alleged threat.

Therefore, the Court will enter judgment for the City of Vestavia on Officer Cheatwood's ADEA retaliation claims.[13]

## IV. Conclusion

For the foregoing reasons, by separate order, the Court will enter judgment for the City on Officer Cheatwood's claims.

**DONE** and **ORDERED** this September 22, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[13] In his brief in opposition to the City's summary judgment motion, Officer Cheatwood did not respond to the City's arguments regarding his claim for retaliatory pre-termination discipline. Therefore, the City is entitled to judgment in its favor on count three of Officer Cheatwood's amended complaint. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.' . . . grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (quoting *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986) and citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)); *see also B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 758 Fed. Appx. 785, 790-91 (11th Cir. 2018).